UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

BRYAN MORGAN                                                              PLAINTIFF

V.                            NO. 3:18CV00241-JTR

ANDREW SAUL,
Commissioner of Social Security Administration[1]                DEFENDANT

## ORDER

I.  **Introduction:**

Plaintiff, Bryan Morgan ("Morgan"), applied for disability benefits on October 13, 2017, alleging disability beginning on January 1, 2013.[2] (Tr. at 12). After conducting a hearing, the Administrative Law Judge ("ALJ") entered her decision denying benefits. (Tr. at 31). The Appeals Council denied Morgan's request for review. (Tr. at 1). Thus, the ALJ's decision now stands as the final decision of the Commissioner.

For the reasons stated below, the Court[3] reverses the Commissioner's decision and remands the case for further proceedings.

---

[1] On June 6, 2019, the United States Senate confirmed Mr. Saul's nomination to lead the Social Security Administration. Pursuant to Fed. R. Civ. P. 25(d), Mr. Saul is automatically substituted as the Defendant.

[2] Morgan subsequently amended his onset date to January 1, 2016. (Tr. at 12, 44). The relevant time-period for the determination of disability benefits is January 1, 2016 through September 30, 2018, the date on which Morgan last remained insured for purposes of his Title II application for disability benefits. (Tr. at 14).

[3] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge. *Doc. 13*.

## II. The Commissioner's Decision:

The ALJ found that Morgan had not engaged in substantial gainful activity from January 1, 2016 through September 30, 2018, Morgan's date last-insured. (Tr. at 14). At Step Two, the ALJ found that Morgan has the following severe impairments: chronic knee joint pain, chronic posttraumatic stress disorder ("PTSD"), and unspecified depressive disorder with anxious distress. *Id*.

After finding that Morgan's impairments did not meet or equal a listed impairment (Tr. at 15-17), the ALJ determined that Morgan had the residual functional capacity ("RFC") to perform a full range of light work, except that: (1) he could perform simple, routine, and repetitive tasks; (2) he could make simple work-related decisions; (3) he could concentrate, persist, and maintain pace with normal breaks; (4) he would require incidental interpersonal contact with co-workers but he could not perform work with the public; and (5) he would require simple, direct, and concrete supervision. (Tr. at 17).

The ALJ found that, based on Morgan's RFC and testimony from the Vocation Expert ("VE"), he was *unable* to perform his past relevant work.[4] (Tr. at 28-29, 60). Relying upon the testimony of a Vocational Expert ("VE"), the ALJ

---

[4] His past relevant work was as a **Rice Sampler** (medium physical exertion, semi-skilled, SVP 4); a **Postal Clerk Supervisor** (light physical exertion, skilled, SVP 6); and a **Mail Room Sorter** (light physical exertion, unskilled, SVP 2). (Tr. at 29).

found that, based on Morgan's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that he could perform, including positions as **Cleaner/Janitor** (light physical exertion, unskilled, SVP 2) and **Hand Packer** (light physical exertion, unskilled, SVP 2). (Tr. at 30). Thus, the ALJ held that Morgan was not disabled. *Id.*

### III. Discussion:

#### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in

the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d. at 477.

    B.   Morgan's Arguments on Appeal

Morgan contends that substantial evidence does not support the ALJ's decision to deny benefits. Specifically, he argues that: (1) the ALJ gave too much weight to the opinion of the consultative psychological examiner; (2) the RFC did not incorporate all of Morgan's limitations; and (3) the ALJ failed to properly develop the record. As a result of those errors, and other errors committed by the ALJ at Steps Four and Five of her sequential disability analysis, Morgan argues that the decision in this case must be reversed and remanded.

Morgan is a 52-year-old war veteran of wars in Iraq and Afghanistan. In 2016, he was assigned a 100% disability rating by the Veterans' Administration ("VA") based on the severity of his PTSD.[5] (Tr. at 43, 49-50, 737). According to Morgan, during the Iraq War, his base in Kuwait was blown up and he saw many people die. (Tr. at 514, 618-620). He continues to struggle with nightmares, flashbacks, insomnia, explosive rage, anxiety, road rage, suicidal tendencies, and addiction, as

---

[5] Post-traumatic stress disorder (PTSD) "is a complex anxiety disorder that may occur when individuals experience or witness an event perceived as a threat and in which they experience fear, terror, or helplessness." http://go.gale.com/PTSD (*The Gale Encyclopedia of Medicine* (Vol. 6 5th ed. at 4087)).

4

a result of his PTSD. (Tr. at 18-20, 709-722). At the administrative hearing, Morgan testified that, during times of stress, a switch gets flipped and he wants to kill someone. (Tr. at 51-55, 514).

Morgan's second wife, Tara, filed for three Orders of Protection in 2011 and 2012, for his death threats and harassment of her and their two children. (Tr. at 214-264). At one point, Morgan was harassing Tara's coworkers. (Tr. at 272). Morgan's first wife, Kimberly, filed an Order of Protection in 1996 for similar reasons. (Tr. at 242).

Morgan had trouble keeping a job because of his PTSD symptoms and explosive behavior. He worked at the U.S. Postal Service ("USPS") in 2012 as a Postal Clerk Supervisor. (Tr. at 29, 47). Because of a confrontation with a coworker, the USPS sent Morgan for a mental evaluation, which was performed by William Fulliton, Ph.D. (Tr. at 794-797). According to Dr. Fulliton's report, dated January 5, 2012, Morgan had higher than normal levels of anger, triggered by insomnia. (Tr. at 47, 794-797). Based on Morgan's PTSD, insomnia, and depression, Dr. Fulliton found that "it is likely that [Morgan] will be unable to maintain emotional stability and the ability to work closely with others, without further treatment." (Tr. at 796-797). Dr. Fulliton said that Morgan's aggressive and explosive behaviors were "not pathological of themselves, but describe someone who will likely find it challenging

to work in a team." *Id*.

Based on Dr. Fulliton's findings, the USPS demoted Morgan from Postal Clerk Supervisor to Mail Sorter, and required him, as a special accommodation, to work in a room in complete isolation from his coworkers and supervisors. (Tr. at 19, 47-48). In April 2012, the USPS fired Morgan for allegedly stealing American flags from work. (Tr. at 194, 199-201).

In 2013, Morgan attended barber school and began working as a barber in 2015. (Tr. at 48-51). However, in 2016, he was fired by the head barber, after only a few months of working, because of his contentious behavior toward customers. *Id*. According to Morgan, he could not find a job after that because of his reputation for having a short fuse. *Id*.

1. Medical Evidence Documenting Morgan's Long-Standing Struggles With Chronic PTSD And Related Psychological Problems

In 2010, Morgan was hospitalized for six days at Lakeside Behavioral Health System. (Tr. at 19). His Global Assessment of Functioning score was 20, which indicates serious and dangerous problems. (Tr. at 516). Morgan said his mental health was spiraling out of control, he was a danger to his wife and coworkers, and he feared he would "blow his head off." (Tr. at 514). Morgan also had inpatient

treatment for alcohol and drug-related issues.⁶ (Tr. at 19).

Morgan has participated in mental health treatment, with both a counselor (Mike Leatherwood) and a VA psychiatrist (Dr. Sherry Martin-McCaughtry, D.O.) from October 2017 through at December 2018.⁷ (Tr. at 37-38, 50, 799). He tried EMDR with Mr. Leatherwood (whom he saw twice weekly for over a year), which is "a unique, nontraditional form of psychotherapy designed to diminish negative feelings associated with memories of traumatic events."⁸ (Tr. at 50). As Morgan noted, it is only a treatment, with some amount of effectiveness, but it can never heal the psychological damage from PTSD completely. (Tr. at 50-51). Morgan was compliant with treatment, and his medications helped to a degree, so he had some periods of calm. But most months he would have 3-4 days of depression when he couldn't leave his room. (Tr. at 54-55).

As the Court noted in *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996), a period of remission in chronic psychotic disorders does not mean that disability

---

⁶ The Arkansas Department of Health approved Morgan for a medical marijuana card in April 2018 to treat his psychological problems. (Tr. at 386).

⁷ For reasons not readily apparent, there are no records from Morgan's treatment by Mr. Leatherwood in evidence, but such treatment was confirmed by Morgan, his attorney, and VA health providers. Mr. Leatherwood did submit a letter dated June 19, 2018 indicating he had treated Morgan consistently since October 2017. (Tr. at 799).

⁸ *See* https://www.psychologytoday.com/us/therapy-types/eye-movement-desensitization-and-reprocessing-therapy.

7

has ceased, and remissions may be of uncertain duration:

> "An individual's level of functioning may vary considerably over time. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. . . . Some individuals may have attempted to work or may actually have worked during the period of time pertinent to the determination of disability. . .
>
> Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. . . Such individuals may be much more impaired for work than their signs and symptoms would indicate."

*Id*.

On December 20, 2017, Morgan underwent a mental status evaluation at the VA by Russell Dixon, Ph.D. (Tr. at 760-763). In his report, Dr. Dixon, a clinical neuropsychologist, noted that Morgan was a veteran who served his country well, but he had a 100% service connected disability for PTSD, as well as ongoing problems with insomnia. (Tr. at 762). Dr. Dixon's clinical notes identified that Morgan was having homicidal urges at the time. *Id*. Dr. Dixon also said that Morgan was benefiting to some degree from his treatment with Mr. Leatherwood, and both Dr. Dixon and Morgan agreed that duplicating treatment with a VA therapist would not be necessary. *Id*. Mr. Leatherwood's letter, dated June 19, 2018, stated that

Morgan had been punctual at all appointments, cooperative, and highly motivated for treatment. (Tr. at 799). Morgan testified that even with his regular treatment with Mr. Leatherwood, he was still having debilitating explosive episodes 3 to 4 times a month. (Tr. at 56).

On January 9, 2018, Morgan underwent a consultative psychological examination by Anita Gail Wells, Ph.D., at the request of the state disability determination agency.[9] (Tr. at 709-725). Morgan explained to Dr. Wells that: (1) he had been divorced three times: (2) he had been arrested 5-10 times: (3) he had used a variety of drugs and alcohol and was still drinking; (4) he was assigned military duty in Kuwait where he saw his base get blown up: (5) he was honorably discharged from the military; (6) he had trouble sleeping; (7) and he mostly stays in bed each day and feels sad daily (but he could perform minimal activities of daily living). *Id*. Morgan had attended numerous domestic battery and anger management support groups. (Tr. at 796). He said he treated with a therapist weekly and that he was

---

[9] Social Security disability claims, while governed by the federal Social Security Administration ("SSA"), are initially processed through a network of local SSA field offices and State agencies (usually called Disability Determination Services or DDSs). Subsequent appeals of unfavorable determinations may be decided in a DDS or by an administrative law judge in SSA's Office of Disability Adjudication and Review. https://www.ssa.gov/disability/determination.htm Usually, the DDS tries to obtain evidence from the claimant's own medical sources first. If that evidence is unavailable or insufficient to make a determination, the DDS will arrange for a consultative examination (CE) to obtain the additional information needed. The claimant's treating source is the preferred source for the CE, but the DDS may obtain the CE from an independent source, such as Dr. Wells. *Id*.

compliant with taking Trazadone, Alprazolam, and Cymbalta. (Tr. at 713-714). He said the medications he took for insomnia sometimes helped and sometimes didn't. *Id.* He told Dr. Wells that his 100% disability rating from the VA was for PTSD, and that he had seen Suzanne Gibbard, Ph.D., in 2010 and 2011 for stress. (Tr. at 571). Morgan also told Dr. Wells about his regular treatment with Mr. Leatherwood. (Tr. at 720).

For reasons not apparent in the record, Dr. Wells only received a few exhibits from the DDS (Little Rock) (Tr. at 709): (1) two office notes from Morgan's PCP from April 2016 (Tr. at 683-685); (2) a Pain Report and a Function Report filled out by Morgan on October 19, 2017 (Tr. at 298-301, 332-340); (3) the psychological evaluation performed by Dr. Fulliton, which is dated January 5, 2012 (Tr. at 794-797); and (4) a single-page letter from the VA dated October 12, 2017, showing a 100% service connected disability (Tr. at 172). Dr. Wells was provided no records from the VA related to Morgan's diagnosed PTSD, which the VA doctors opined was a serious condition. She also received no treatment records from Dr. Gibbard or Mr. Leatherwood. Social Security Regulations require that "a consultative examiner be given any necessary background information about the claimant's condition." 20 C.F.R. § 404.1517. Such background information is essential because consultative exams are used to "resolve an inconsistency in the evidence" or when "the evidence

10

as a whole is insufficient to allow [the Administration] to make a determination or decision in [the] claim." *Id*. § 404.1519a(b).

In Dr. Wells's report, she reached the startling conclusion that, because Morgan's inability to resist aggressive tendencies pre-dated his military service, this somehow prevented her from diagnosing him with PTSD. (Tr. at 722). She also concluded that he would be able to function effectively as far as work tasks were concerned, but gave no explanation of how she arrived at that conclusion. (Tr. at 722-724). Finally, she gave *no opinion* on Morgan's well-documented ability to interact with others in a work environment. Given the limited information and medical records that DDS (Little Rock) provided to Dr. Wells (Tr. at 709), perhaps these shortcomings in her report are understandable.

2. The ALJ's Decision

Despite the limitations and deficiencies in Dr. Wells's report, the ALJ gave it "some weight" in determining Morgan's RFC, which included a finding that Morgan could perform a job that "required incidental interpersonal contact with co-workers." (Tr. at 28). In addition, the ALJ relied on the fact that Morgan had shown some improvement from his counseling and treatment for PTSD, without acknowledging his subsequent relapses.[10] The Court concludes that neither the ALJ's determination

---

[10] The ALJ entered her decision on October 12, 2018. (Tr. at 31). On October 18, 2018, Morgan

of Morgan's RFC, nor her subsequent Step 4 and Step 5 findings are supported by "substantial evidence."

The ALJ also erred in asking the VE a series of confusing hypotheticals, which failed to accurately capture the limitations and restrictions that Morgan's chronic PTSD and anxiety disorder imposed on his ability to work in the presence of *any* coworkers. Furthermore, the following colloquy strongly suggests that the ALJ's questions were aimed at eliciting responses from the VE that supported the outcome she had already decided, *i.e.*, Morgan was not disabled:

> **ALJ**: First, I am limiting Mr. Morgan to no more than light and unskilled work, so let me just start there, we're light and unskilled. Would any of the past work be available?
>
> **VE**: At light, unskilled, the sorting work would be done, Mail Room Sorter.
>
> **ALJ**: Main Room Sorter. And if I have these additional limitations, where the individual can perform simple, routine, and repetitive tasks, can make simple work-related decisions, can

---

submitted to the Appeals Council his request for review of the ALJ's decision. (Tr. at 5). Subsequently, Morgan's attorney submitted a two-page record from Dr. Martin-McCaughtry from the VA indicating that Morgan had relapsed and that she highly recommended inpatient treatment for PTSD. (Tr. at 37-38). The record supports this recommendation: On November 30, 2017, Janice Wheeler, LMSW from the VA, saw Morgan for PTSD, increased insomnia, and suicidal ideations.(Tr. at 765); and on December 20, 2017, Dr. Dixon noted PTSD and continuing issues with insomnia. (Tr. at 762).

concentrate, persist, and maintain pace with normal breaks, requires *incidental interpersonal contact with coworkers*, but no work with the public, and requires simple, direct, and concrete, supervision. Could the Mail Sorter position still be performed?

**VE**: Yes, it could.

**ALJ**: You had an individual same age, same education, same work experience, everything remains, the same, we're still at light, however, this individual in addition to no work with the public, would have, *could have no work with coworkers*. Could the Mail Sorter position still be performed?

**VE**: It could be performed as it was performed by the claimant. It's not always performed without coworkers present.

**ALJ**: Okay, but as he performed it, as they had it, okay. And if you have an individual, same age – well, let me ask – in your opinion would there be any other jobs that could be performed in addition to the **Postal Clerk** position as he performed it?

**VE**: *And that's light with no coworkers at all, Judge, is that correct?*

**ALJ**: Yes, no work with coworkers – *well, let me go back to the incidental interpersonal contact with coworkers, but no work with the public*.

**VE**: Okay. So yes, at, based on that hypothetical, there would be other unskilled, light jobs. An example of one of those would include work in the area of cleaning and as a janitor, and these jobs are unskilled, SVP 2 at light. Nationally, approximately 220,000 jobs, with DOT (*Dictionary of Occupational Titles*) code 323.687-014. Also, I would recommend work as a hand packer, and packing jobs are unskilled, SVP 2 at light. Nationally, approximately 300,000 jobs, with DOT code 920.687-166.

**ALJ**: All right, now if we limit an individual, same age, same education, same work experience, to no work, again light as defined in the regulations, but no work with coworkers and no work with the public. A supervisor would come around and check on the work, so and this would be simple, direct, and concrete supervision. Would any of those jobs or other jobs be available?

**VE**: Judge, I'll state the, the, some janitorial jobs you would be working on your own, however, *I would say that at the*

*light work, it would not be guaranteed that coworkers would not be present with you at times, if that makes any sense.* You wouldn't need someone to communicate to perform job duties, but it's possible that you would have a coworker in your vicinity with you.

      **ALJ**: All right. However, if you have an individual, same age, same education, same work experience, and this individual is going to miss work or be late more than twice per month, or require frequent unscheduled breaks at will, does that eliminate all jobs?

      **VE**: Yes, it does.

After the ALJ completed her questioning of the VE, Morgan's attorney pointed out that, the job of mail sorter, *as it was performed by Morgan*, involved *no contact whatsoever* with any of his coworkers. (Tr. at 62-63). His attorney also noted that: (1) this special accommodation by the USPS *was specific to Morgan*; and (2) no other prospective employer would agree to such an extraordinary accommodation as a condition for hiring Morgan. *Id*. The ALJ did not ask the VE any follow-up questions to account for these important undisputed facts brought to her attention by Morgan's counsel. *See Andler, supra*, 100 F.3d at 1393 (the ALJ erred by not finding

15

that claimant was working under "special conditions" when he had to visit a VA counselor for PTSD once a week).

The ALJ also erred at Step Four, where the burden of production shifts to the Commissioner if the claimant is unable to perform his past relevant work. *Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). Importantly, the test at Step Four is whether a claimant can return to past work as it is "actually or generally" performed in the national economy. *See Martin v. Sullivan* 901 F.3d 1127, 1130 (8th Cir. 2005). Morgan actually performed the Mail Sorter job in an isolated room with *no contact at all* with others, in order to insulate him and his coworkers from the inevitable conflict that arose if he had any interaction with those around him.

The VE testified that, if Morgan had no contact with coworkers or the public, he could return to past work as a Mail Sorter, presumably with the same special accommodation to avoid Morgan "flipping a switch" as he had done in the past. (Tr. at 47, 60). But the ALJ found at Step Four that Morgan ***could not*** return to the Mail Sorter job. (Tr. at 29). Then, in her next hypothetical, the ALJ imposed the additional restriction of "no contact" with coworkers or "incidental contact" with coworkers. Based on his responses, it appears the VE was confused by the ALJ's question, but gave an answer suggesting there might well be *no work* Morgan could perform

16

because he qualified his answer by stating "it would not be guaranteed that coworkers would not be present. . . ." Once again, the ALJ asked no follow-up questions to clarify the VE response, which the VE himself acknowledged might not "make any sense." (Tr. at 61).

The ALJ also mistakenly asked the VE about the ***Postal Clerk*** position, not the Mail Sorter position. (Tr. at 60, emphasized above at p. 11). When the VE testified that a **Janitor** job would likely have some coworkers in the vicinity (something Morgan's limitations excluded), the ALJ still used that job as evidence Morgan could work at Step Five. The VE also identified **Hand Packer** as another job Morgan could perform, but there was no discussion by either the VE or the ALJ about how Morgan could perform that job in light of his severe PTSD, which prevented any contact with coworkers. Nevertheless, the ALJ concluded that Morgan could also perform that job, at Step Five. (Tr. at 30).

Accordingly, the Court also concludes that the ALJ's determinations, at Steps Four and Five, are not supported by substantial evidence.[11]

Finally, given the medical evidence of Morgan's long-term struggle with

---

[11] As previously noted, Dr. Wells, the consultative psychological examiner was not provided with all of Morgan's relevant medical records required for her to make a proper and reliable evaluation of Morgan's psychological limitations. Therefore, the ALJ's reliance on Dr. Wells's report does not constitute substantial evidence.

17

chronic PTSD, it is difficult to understand why the Appeals Council did not consider the VA medical records, from September of 2018, indicating that inpatient treatment for Morgan's PTSD was *highly recommended*. (Tr. at 2, 37-38). Those medical records clearly suggest that Morgan had relapsed. The Appeals Council received those records from Morgan's attorney before it made its final determination not to reconsider the ALJ's decision. (Tr. at 1-2). The Appeals Council found that the new records did not "show a reasonable probability that [the records] would change the outcome of the decision," so the Appeals Council did not exhibit the records. *Id*.

## IV. <u>Conclusion</u>:

Morgan's long history of chronic PTSD, anxiety, homicidal and suicidal urges, depression, anger management issues, and insomnia make it difficult for him to perform normal workplace activities, despite his efforts to get better by attending mental health counseling and taking his prescribed medication. Specifically, those severe psychological limitations resulted in him being fired from his last two jobs working as a mail sorter for the USPS, and as a barber. The Step 5 conclusion that Morgan was able to perform "other jobs" was predicated on the ALJ's speculation that Morgan had improved sufficiently to be able to work in jobs that required "incidental interpersonal contact with co-workers." *See McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)(substantial gainful employment requires "the ability

to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world"). That conclusion is seriously undermined by Morgan's testimony; his medical records related to his longstanding PTSO; and, most recently, a two-page document from the VA, dated September 11, 2018, recommending that Morgan receive inpatient treatment for his PTSD. (Tr. at 37-38).

Because the ALJ committed reversible errors that were prejudicial to Morgan and her decision is not supported by substantial evidence, the Commissioner's decision must be reversed. On remand, the ALJ must update and fully develop the medical record. The ALJ must also order a new consultative psychological examination and ensure that the examining medical expert has access to *all* of Morgan's relevant medical records.

IT IS THEREFORE ORDERED THAT the final decision of the Commissioner is REVERSED and the case is REMANDED for further review consistent with the foregoing directions.

DATED this 5th day of November, 2019.

_____
UNITED STATES MAGISTRATE JUDGE